UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**GAINESVILLE RESIDENTS UNITED,** )
**INC.**, a Florida not-for-profit corporation, )
**IRVING W. WHEELER, JR.,** )
**ROBERT HUTCHINSON**, )      CASE NO.:
**SUSAN BOTTCHER**, )
**MICHAEL VARVEL,** )
**EVELYN FOXX** and )
**JOSEPH W. LITTLE**, )
)
     Plaintiffs, )
)
vs. )
)
**RON DESANTIS,** in his official capacity as )
Governor of the State of Florida, )
**ASHLEY MOODY**, in her official capacity )
as Attorney General of the State of Florida, )
**CORD BYRD**, in his official capacity as )
Secretary of State of the State of Florida, )
and the Nominal Defendant, )
**CITY OF GAINESVILLE**, a Florida )
municipal corporation, )
)
     Defendants. )
_____/

## <u>VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT,</u>
## <u>INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiffs bring this suit pursuant to 42 U.S.C. §1983, seeking declaratory and

injunctive and relief against the Special Law of the Florida Legislature (House Bill

1645) amending chapter 12760, Laws of Florida (1927) (as amended by chapter 90-394, Laws of Florida), creating the "Gainesville Regional Utilities Authority", as the Special Law is unconstitutional under the First and Fourteenth Amendments to the United States Constitution, and violates the laws and Constitution of the State of Florida.

## JURISDICTION

1.    This suit is brought pursuant to 42 U.S.C. §1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

2.    This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution, and under 28 U.S.C. §1343(4) to secure equitable or other relief for the protection of civil rights.

3.    The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

4.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

5.     The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

6.     This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiffs' rights, privileges, and immunities under the Constitution of the United States and Title 42 U.S.C. §§1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

7.     This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain laws, policies and practices of the Defendants. There are substantial bona fide doubts, disputes, and questions that must be resolved concerning the Defendants' actions taken under color and authority of "state" law and procedures, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

## **VENUE**

8.     Venue is proper in the Northern District of Florida, Gainesville

Division, since the Defendant, CITY OF GAINESVILLE is situated in Gainesville, Florida and the laws and policies complained of affect citizens of Gainesville, and Alachua County; all of which lie within the district and geographical area assigned to the Gainesville Division.

## **PARTIES**

9.    GAINESVILLE RESIDENTS UNITED, INC. is a Florida not-for-profit corporation with its principal place of business located at 4728 NW 37th Way, Gainesville, Alachua County, Florida 32605. GAINESVILLE RESIDENTS UNITED, INC. is a Florida non-profit corporation serving as a public interest entity for the following purpose:

> To operate exclusively as a statewide organization that supports or opposes statewide, multi-county, legislative, or local issues, and other activities not prohibited by law.

10.    Plaintiff is the entity beneficially interested in the relief herein sought and seeks to invoke the original jurisdiction of this Court on account of the facts and matters herein stated. GAINESVILLE RESIDENTS UNITED, INC. has both associational standing and organizational standing to maintain its claims.

11.    With respect to the instant action, GAINESVILLE RESIDENTS UNITED, INC. opposes the loss of local political accountability accompanying the enactment of the Special Law; the operation of a regional utility through a politically unresponsive appointed body; and the prohibition against any operations founded on

environmental, political, or other socially beneficial concerns. Plaintiff is further concerned that the Special Law was not enacted in accordance with the Florida Constitution or the statutory and due process requirements for special acts. Finally, Plaintiff is concerned that it will not be able to address its issues and concerns to the Gainesville Regional Utilities Authority on account of the limitations on content imposed by §7.12 of the Special Law.

12.     Plaintiffs HUTCHINSON, WHEELER and BOTTCHER are members and officers of GAINESVILLE RESIDENTS UNITED, INC., an organization with more than one hundred supporters.

13.     The rights of the members of GAINESVILLE RESIDENTS UNITED, INC. are in jeopardy because the Special Law limits Plaintiff's ability to educate and inform those persons who control Gainesville Regional Utilities ("GRU")[1] for the benefit of its members and other residents of Gainesville and Alachua County, Florida.

14.     GAINESVILLE RESIDENTS UNITED, INC. asserts claims and requests relief which do not require the participation of its individual members.

---

[1] Gainesville Regional Utilities is a department or division of the City of Gainesville and does not have a separate legal existence. Accordingly any reference to Gainesville Regional Utilities or "GRU" should be treated as a reference to the City of Gainesville.

15.     Plaintiff, IRVING W. WHEELER, JR. (hereinafter "WHEELER"), is an individual, sui juris, residing within the city limits of Gainesville Florida. At all times material hereto, WHEELER has been and remains a customer of Gainesville Regional Utilities. WHEELER is a former member and chair of the Gainesville Utilities Advisory Board.  WHEELER has spoken frequently before the Gainesville City Commission and at other public forums on a wide variety of issues concerning Gainesville Regional Utilities, including solar feed-in tariffs and net-metering, reducing solar permit review times, increased funding for energy and water conservation programs to reduce use and thus total billing for disproportionally impacted customers, building utility-scale solar to reduce fossil fuel burning, and City implementation of an EV ready ordinance along with funding for public access charging stations.

16.     Many of these goals advanced by WHEELER address social, political, or ideological interests, as well as industry best practices.  WHEELER has advocated to include these goals in the Utility Integrated Resource Plan and in the drafting of a UAB Policy Plan. All of those interests would fall within the concepts prohibited by the challenged Special Law.

17.     Plaintiff, ROBERT HUTCHINSON (hereinafter "HUTCHINSON"), is an individual, sui juris, residing within the territory of electric service provided by City of Gainesville utilities, but outside the corporate limits of the City.

HUTCHINSON has been a utility customer of the City of Gainesville since the mid-1980s. HUTCHINSON shares concerns regarding Gainesville Regional Utilities in common with thousands of utility customers who are in the "extra-jurisdictional area" served by the utility.

18.     HUTCHINSON was a former employee of the City of Gainesville, including as an Energy Conservation Analyst, as a Utilities Public Information Specialist, and as Director of the Gainesville Downtown Redevelopment Agency. In these roles, he dealt with the social, political, and ideological aspects of utility programs and policies. Some of these decisions were political, such as how much to spend on placing overhead electrical services underground which is costly, but has long-term benefits for reliability and community aesthetics. Another was whether wastewater pipes, which historically were run in low areas, should be removed from creek basins where they were disruptive to hydrology, and environmentally problematic when they were damaged or required maintenance.

19.     HUTCHINSON served for twelve years on the Board of the Alachua County Commission. As a Commissioner, HUTCHINSON frequently dealt with the City of Gainesville regarding utilities issues. These related to comprehensive planning and growth management, environmental protection and water supply, and the provision of internet and emergency radio communications; all of these services are provided by the City of Gainesville's utility department on either side of the

Gainesville's corporate limits, but whose extensions were partially regulated by the Alachua County Commission.

20.     HUTCHINSON has served on several organizations' boards, including the Gainesville Area Chamber of Commerce, the Community Foundation of North Central Florida, and most recently, Gainesville Residents United, Inc. With each of these community organizations, issues that are social, political, and ideological in nature are frequently considered with respect to City of Gainesville policies, programs, and particularly finances, which are inseparable from the operation of the Utilities. HUTCHINSON provides input to City Commission candidates and sitting commissioners regarding how the City can balance social justice, economic sustainability, environmental protection, and climate change, with the community's need for safe, reliable, and economical utility services.

21.     Plaintiff, SUSAN BOTTCHER, (hereinafter "BOTTCHER"), is an individual, sui juris, residing within the city limits of Gainesville Florida. At all times material hereto, BOTTCHER has been and remains a customer of Gainesville Regional Utilities. BOTTCHER was elected to serve as a City Commissioner for the City of Gainesville. In that role, BOTTCHER was ultimately responsible, along with the other Commissioners, for the management and oversight of Gainesville Regional Utilities. In her official capacity as City Commissioner, BOTTCHER heard frequent comments and complaints at public hearings from interested residents and customers

of GRU about every aspect of the utility's operations. As an elected official, BOTTCHER was ultimately responsive to the will of the electorate and could be voted out of office if she failed to serve voters' interests in connection with GRU. As a private citizen, BOTTCHER has continued to pursue her interest in the operations of GRU, and has added her voice to that of many other citizens concerned with the finances of that utility, as well as social issues, such as GRU's responsiveness to its customers, local control over all aspects of the utility, and environmental issues, such as renewable energy and climate change.

22.    BOTTCHER previously sued the City of Gainesville and others to challenge an earlier effort to change management control of GRU by way of a referendum. *See*, Bottcher, et al v. Kim A. Barton, in her official capacity as Supervisor of Elections, et al, Case No.: 2018 CA 001546 (Fla. 8th Jud. Cir. Alachua Cty). In this litigation, BOTTCHER intends to pursue the same goal of maintaining local control over GRU through an elected Gainesville Commission.

23.    Plaintiff MICHAEL VARVEL (hereinafter "VARVEL") is an individual, sui juris, who has been employed by the City of Gainesville for more than twenty years.  VARVEL currently works in Customer Service for Gainesville Regional Utilities. The work of customer service encompasses service connections and disconnections, billing and payments, credit checks, service theft investigations, energy and water conservation recommendations, and public information. Utilities

Customer Service representatives perform their duties face-to-face, over the telephone, and via the internet. They interact with Codes Enforcement, Building Inspectors, Growth Management and Planning Departments, E-911 Addressing, law enforcement agencies, social service agencies, and others.

24.     VARVEL believes the City of Gainesville must strengthen the interface between utility customers and their utility needs, and that austerity measures which result in lower reliability, fewer options for customers, and a less personalized touch (i.e., a more automated relationship) that is common in larger utilities will harm the most vulnerable utility customers of Gainesville.

25.     Customer Service employees frequently deal with customers who are under financial duress, for which the Customer Service employees use creative combinations of programs, policies, and outside funding to assist customers in solving their short- and long-term issues. Diversity, Inclusion, and Equity efforts by GRU have guided past decisions and current policies to help customers during times of duress, whether caused by financial setbacks, health reasons, or extreme weather events.

26.     VARVEL, and other GRU employees, are concerned that the Special Law will directly impact their ability to provide vital customer services of this nature, that the public interest will be harmed and that their employment may be at

risk if they continue to provide socially useful information that could be perceived as promoting Diversity, Inclusion, and Equity.

27.    Like many government employees, VARVEL is eligible upon retirement for a fixed-benefit pension which the City provides as a benefit. The Gainesville City Commission serves as the Board of Trustees for the General Employees' Pension Plan.  A "Pension Review Committee" (PRC) appointed by the City Commission advises the Board of Trustees on investment policies. Prior to July 1, 2023 (the effective date of the Special Law), VARVEL and other employees had the ability to talk with City Commissioners directly, or to attend meetings of the Pension Board of Trustees or of the PRC. The Special Law is silent on the concerns of VARVEL and other employees regarding who will be making future decisions about pension issues, including funding levels, investment decisions, and changes in benefits, such as periodic cost of living adjustments. VARVEL is aware that boards appointed by the Governor in other areas of state governance have attacked pension managers and their investment portfolios.

28.    Plaintiff, EVELYN FOXX (hereinafter "FOXX"), is an individual, sui juris, who has resided within the city limits of Gainesville Florida for 29 years, where she has been and continues to be a customer of Gainesville's utility services. She has been a life insurance agent for nearly fifty years. FOXX is active in civil rights, social justice, and garnering turnout for elections as a community organizer  - for the

past twelve years in her position as President of the Alachua County Chapter of the NAACP. She continues to serve on the Community Remembrance Project Committee, the mission of which is overseeing the historical reckoning necessary for racial truth, justice, and reconciliation. FOXX has been engaged in efforts to open up housing, educational, and employment opportunities for minorities working with local governments and the private sector.

29. With regard to Gainesville Regional Utilities, FOXX has advocated for policies which assist local residents to conserve energy and water, to even-out utility bills at the system-wide level with a rate-stabilization fund, and to assist residents to keep lights on in homes through policies that reduce abrupt utility bill shocks for people in financial duress.

30. FOXX has stated publicly and to Legislators that that the process of passing the Special Law was undemocratic and discriminatory; the local bill had no local public hearing, citizens were denied a referendum, and the Legislature did not consider amendments proposed by the only representative in Gainesville's five-person delegation who actually lives in Gainesville.

31. Plaintiff, JOSEPH W. LITTLE, (hereinafter "LITTLE"), is an individual, sui juris, residing within the city limits of Gainesville Florida. At all times material hereto, LITTLE has been and remains a customer of Gainesville Regional Utilities. LITTLE was elected to serve as a City Commissioner for the City of

Gainesville and was Mayor of Gainesville from 1975 through 1976. Little was also a founding member of a joint City of Gainesville-Board of County Commissioners of Alachua County Joint Board formed in the 1970s to recommend utility polices to the City of Gainesville and served as initial chairman of the Joint Board. In the role, of Commissioner and Mayor, LITTLE was ultimately responsible, along with the other Commissioners, for managing and overseeing Gainesville Regional Utilities. In his official capacity as City Commissioner and Mayor, LITTLE heard frequent comments and complaints at public hearings from interested residents and customers of GRU about every aspect of the utility's operations. As an elected official, LITTLE was ultimately responsive to the will of the electorate and could be voted out of office if he failed to serve voters' interests in connection with GRU.

32.    As a private citizen, LITTLE has continued to pursue his interest in the operations of GRU, and has added his voice to that of many other citizens concerned with the finances of that utility as well as social issues such as GRU's responsiveness to its customers, local control over all aspects of the utility, and environmental issues such as renewable energy and climate change.

33.    At all times material hereto, Plaintiff, LITTLE was and is a bondholder of debt issued by the CITY OF GAINESVILLE secured by GRU revenues. As a bondholder, LITTLE has contract rights apart from any rights he may have under Federal or Florida statutory or constitutional provisions. The bond includes specific

covenants and limitations on the CITY OF GAINESVILLE's ability to change the control, ownership and management structure of GRU. The bond further dictates certain specific limitations and requirements with respect to GRU's rate structure and the process by which rates are set. LITTLE's rights as a bondholder have been compromised, the value of his bond has been diminished and certain covenants have been breached, by the enactment of the Special Law.

34.    Defendant, RON DESANTIS, is the Governor of Florida ("DESANTIS") and is sued in his official capacity. DESANTIS signed the Special Law as the final step in the enactment process. As the official exclusively and specifically obligated and empowered by the Special Law to issue public notices soliciting citizen nominations for members of the Authority, to appoint the members of and to fill vacancies on the Authority, and to remove members of the Authority, DESANTIS has actual, control over the Authority and is intimately connected to the implementation of the Special Law. As the official specifically authorized to appoint and remove members of the Authority, DESANTIS serves in the supervisory role previously occupied by the CITY OF GAINESVILLE.

35.    Defendant ASHLEY MOODY is the Attorney General of the State of Florida and is sued in her official capacity. The Attorney General is ultimately responsible for the enforcement of the laws of the State of Florida, including special acts. The Attorney General is Florida's chief legal officer and is vested with broad

authority to act in the public interest and, when she deems it necessary, to defend statutes against constitutional attack. The Attorney General has the statutory duty to "appear in and attend to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, [in the] courts of this state or in any courts of any other state or of the United States." *See*, §§16.01(4), (5), Fla.Stat. The Attorney General also has authority under the common law to protect the public interest through litigation.

36.    Defendant, CORD BYRD, is the Secretary of State of the State of Florida and is sued in his official capacity.  The Secretary of State is responsible for custody of the original statutes and records for the State of Florida. *See* §§ 20.01 and 15.01, Fla.Stat. As such, the Secretary is the official responsible for striking, expunging, or removing any statute or law that is invalidated.

37.    Defendant, CITY OF GAINESVILLE, Florida, is a Florida municipal corporation, organized and operating under the laws of the State of Florida. While the assets, operational control and authority over Gainesville Regional Utilities have been delegated and assigned to the Gainesville Regional Utilities Authority by the Special Law, legal title to those assets remains with the CITY OF GAINESVILLE. The CITY OF GAINESVILLE also remains liable for all of the debts, contracts and obligations of Gainesville Regional Utilities, including bonds issued in connection with the utility. As a unit of the CITY OF GAINESVILLE, the Gainesville Regional

Utilities Authority remains a legal part of the City and does not have separate legal existence. Accordingly, the CITY OF GAINESVILLE is properly sued as a nominal Defendant.

38.    Plaintiffs assert that there is substantial doubt as to whether the Gainesville Regional Utilities Authority ("the Authority")[2] is an entity with independent legal existence capable of being sued as a defendant in its own right.

39.    The Authority is described in the Special Law as a "unit" of the City of Gainesville Florida, but it is completely insulated from and independent of the political control of the City Commission and of Gainesville residents. The bundle of rights transferred to the Authority includes the authority to enter into contracts, hire and fire employees, set utility rates, purchase and dispose of property, direct the issuance of bonds, operate all of the properties formerly assigned to Gainesville Regional Utilities, and the capacity to sue in connection with certain Authority operations (specifically, for eminent domain).

40.    Despite that grant of rights and complete operational independence from the City of Gainesville and the City Commission, the Authority remains a unit of the City of Gainesville and is not designated as a special district. As a unit of

---

[2] While the Gainesville Regional Utilities Authority will be referred to as the "Authority" in this Complaint, it should be understood that this is a matter of convenience only. Plaintiff maintains that the Authority does not have separate legal existence and that a suit against the Authority is actually a suit against the CITY OF GAINESVILLE.

municipal government, the Authority is not an "arm" of the State of Florida as its power and authority are limited to the assets and properties which formally belonged to the City of Gainesville, which is an incorporated municipality, itself capable of being sued.

## COLOR OF STATE LAW

41.    All named Defendants are public officials, officials of state agencies or are a municipal government and are acting under color of state law and authority.

42.    The actions of Defendants, acting under color of state law, violate Plaintiffs' constitutional rights to engage in free speech and to petition the government for redress of their grievances.

## HISTORY OF GAINESVILLE REGIONAL UTILITIES

43.    The City of Gainesville has provided utility services to its residents and others since 1912.

44.    Historically, those services have been provided by a department of the City of Gainesville known as "Gainesville Regional Utilities" (hereinafter referred to as "GRU" or "the Utility"). GRU is wholly owned by the City of Gainesville. GRU currently provides electricity, water, sewer and wastewater services, gas and telecommunications services to residents through the City of Gainesville, as well as to subscribers residing outside of the municipal boundaries.

45.    Historically, GRU and its operations have played an out-sized role within the City for a number of reasons:

A.    The City has regularly withdrawn revenues from GRU and deposited them into the City's general revenue fund to pay for all manner of City services. It is universally understood that the City of Gainesville could not maintain the current level of social services without that significant contribution provided by GRU. Those services include everything from cultural events; to affordable housing; to preschool programs; to hiring and equipping police officers; to victims services; to maintenance of parks; to street sweepers. In short, Gainesville would not be the cultural and educational jewel that it is without local political control over GRU and its revenues.

B.    In addition to their importance as sources of revenue, municipal utility systems have direct effects on their communities in terms of planning, aesthetics, pollution control, economic fairness (especially to low income consumers) and discouragement of urban sprawl within their municipalities and service areas, which are not directly related to the costs and financing of the utility systems.

C.    The people of the City of Gainesville and GRU consumers have supported the plans of the elected City Commission of the City of Gainesville to transition energy production to renewable resources, which is costly and uncertain in terms of timing. These decisions cannot be made based on utility economics alone

but must consider vital social interests as well – including the survival of our civilization and the planet itself.

46.    The Gainesville City Commission appointed the manager of GRU who served at the pleasure of the Commission.

47.    While possessing delegated authority to manage and operate the municipal utility system, the manager of GRU was at all times subject to the policies and directives of the elected Gainesville City Commission.

48.    The members of the Gainesville City Commission are elected by the electors of the City of Gainesville.

49.    Residential electors of the City of Gainesville have always exercised political control over the Gainesville municipal utility system through their elected municipal officials.

50.    Historically, residents of Gainesville, and any other interested persons, have brought a wide variety of concerns regarding GRU directly to their elected representatives at public meetings of the Gainesville City Commission. The management, policies and future of GRU were a constant topic of comment, conversation, review and criticism by Gainesville residents and others, including the individual Plaintiffs who have joined this suit.

51.    Among the socially and environmentally important matters discussed recently before the City Commission are the following:

A.    The operations and financing of the Deerhaven Renewable Generating Station biomass facility – an issue of vital public importance even before construction began in 2011.

B.    Public outcry concerning the siting of a new solar energy field near an historically Black community in Archer.

C.    Conversion to renewable energy (wind and solar) and the effect it will have on rates and environmental justice in the community.

D.    Promotion of energy conservation through home and business inspections and more efficient appliances, both for immediate financial benefits to GRU and financial and environmental benefits for its consumers and the community.

E.    Social programs including subsidies and deferment of service cut-offs for customers having difficulty paying their utility bills.

52.    Plaintiffs are uncertain as to what, if any rights, the CITY OF GAINESVILLE has retained with respect to GRU following the enactment of the Special Law. While the CITY OF GAINESVILLE has lost all operational control, it may retain bear legal title to GRU's assets and may ultimately be responsible for the debts and obligations of the utility.

## OVERVIEW OF THE SPECIAL LAW

53.    On May 4, 2023, the Florida Legislature enacted the Special Law entitled:

An act relating to the City of Gainesville, Alachua County; amending chapter 12760, Laws of Florida (1927), as amended by chapter 90-394, Laws of Florida, relating to the City's charter; repealing section 3.06 of the charter, relating to the general manager for utilities of Gainesville Regional Utilities; creating the Gainesville Regional Utilities Authority and establishing it as the governing board of Gainesville Regional Utilities; providing an effective date.

(hereinafter referred to as the "Special Law"). A copy of the Special Law is attached as Exhibit "1" to this Complaint.

54.     DESANTIS signed the Special Law on June 28, 2023. The Special Law went into effect on July 1, 2023.

55.     The Special Law transfers all political, legal, financial and operational control, including rate setting, over GRU from the elected City Commission of the City of Gainesville and reposes it in an unelected Board of the Authority. The Authority Board is appointed by and subject to removal only by the Governor of Florida, who is an executive and not a legislative official of the State of Florida.

56.     The Special Law prohibits any discussion or action which might further "social, political, or ideological interests" – issues which have often been referred to as "DEI" for "diversity, equity and inclusion". The operative language of the Special Law reads as follows:

7.12 Limitation on Utility Directives. The Authority, and the CEO/GM, in making all policy and operational decisions over the affairs of the Utility System as contemplated under the provisions of this act, shall consider only pecuniary factors and utility industry best practices standards, which do not include consideration of the

furtherance of social, political, or ideological interests. Appropriate pecuniary factors and utility industry best practices are those which solely further the fiscal and financial benefit of the Utility System and customers. This provision does not prohibit the establishment and application of rate structures based on utility usage.

## **ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF**

57.    Plaintiffs' speech and petition rights have been denied and chilled now, and in the future, as the Special Law cuts off their ability to engage their elected City of Gainesville representatives on the vital social issues which affect GRU and its relationship to its customers and the community. Plaintiffs' speech and petition rights are directly censored by viewpoint-based and content-based restraints in the Special Law.

58.    Unless the actions, policies and practices of Defendants are enjoined by this Court, all of the Plaintiffs will suffer the continuing loss of their constitutional rights.

59.    All of the Plaintiffs have suffered irreparable injury and continue to suffer irreparable injury as a result of the Special Law and the Defendants' actions to implement and enforce that law.

60.    None of the Plaintiffs has a plain, adequate, or complete remedy to protect their constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

61.    Deprivation of rights guaranteed and protected by the First Amendment to the United States Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, damages are both inadequate and unascertainable.

62.    The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendants, which interfere with the public's rights guaranteed under the First and Fourteenth Amendments.

63.    A permanent injunction will preserve Plaintiffs' civil rights and will minimize the need to award extensive compensatory damages.

## DAMAGES AND ATTORNEY'S FEES

64.    Plaintiffs' First and Fourteenth Amendment rights have been violated and Plaintiffs have suffered damages as a result of the enactment of the Special Law and Defendants' efforts to put that law into effect. Plaintiffs' damages consist of nominal damages associated with the infringement of their constitutional rights.

65.    Plaintiff, LITTLE has suffered unique economic damages as a result of the loss of value of his GRU bond which is directly traceable to the enactment of the Special Law and the actions of the Defendants to put that Act into effect.

66.    Plaintiffs have retained Benjamin, Aaronson, Edinger & Patanzo, P.A. and Ansbacher Law, P.A. as their attorneys to represent them in this action and have

agreed to pay them a reasonable fee, which fee Defendants must pay pursuant to 42 U.S.C. §1988.

## COUNT I
## FIRST AMENDMENT – PETITION CLAUSE

67.    Plaintiffs reallege the facts set forth in Paragraphs 1 through 3 and 6 through 666, and incorporate those facts into this Count by reference.

68.    This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against the Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

69.    Plaintiffs are uncertain as to their rights and remedies under the Special Law as that law has been implemented and applied to Plaintiffs in violation of the Petition Clause of the First Amendment to the United States Constitution.

70.    Plaintiffs have the right to petition their representatives for redress of their grievances, including complaints related to the operations of GRU.

71.    Historically, Plaintiffs have been free to petition the elected City of Gainesville Commissioners for redress of grievances pertaining  to GRU with the expectation that the elected City Commission would redress their grievances subject to voter recall or defeat at the next election.

72.    Plaintiffs and many other persons have petitioned the elected City Commission of the City of Gainesville for redress of grievances pertaining to "social, political, or ideological interests" as they relate to GRU.

73.    These issues have often pertained to rates and services for low income people and social issues such as environmental safety, racial fairness in infrastructure and living wages for GRU employees. These issues have not been confined exclusively to the pecuniary or financial aspects of the utility system.

74.    To Plaintiffs and many other concerned individuals, these social issues are every bit as important as GRU utility rates, bond payments and return on investment.

75.    Section 7.12 of the Special Law infringes upon Plaintiffs' ability to petition for redress of grievances in several respects:

A.    The City of Gainesville Commission no longer has any influence or control over the operations of GRU, its personnel, policies or future. As a result, the City Commission no longer has any ability to respond to Plaintiffs' grievances.

B.    The Authority is governed by a Board which is appointed and is not responsive to anyone other than Governor DeSantis, an executive officer of the State. Thus, Plaintiffs' political rights, including their ability to remove unresponsive representatives from office, have been cut-off.

C.     The Authority is legally precluded from considering or taking actions concerning Plaintiffs' grievances. Plaintiffs allege the following particulars:

(1)     The Special Law provides that meetings of the Authority are to be noticed and open to the public but does not actually state that the public has any right to speak at those meetings.

(2)     Public meetings are limited public forums and boards have the right to limit public discussion to agenda items or other matters presently before the board.

(3)     Because §7.12 expressly prohibits the Board from considering any "social, political, or ideological interests" in making any "policy and operational decisions". the Board will never have an agenda item pertaining to "social, political, or ideological interests" nor will the Board ever take public comment concerning those interests.

(4)     To the extent that the public can speak on any topic before the Board, the only topics which the Authority may legally consider are those which "further the fiscal and financial benefit of the Utility System and customers."

76.     The Special Law eliminates Plaintiffs' and others' rights to petition the Board for redress of grievances pertaining to social, political, environmental, and ideological issues that are inherent in the operation of a utility system.   Even if the Authority allowed Plaintiffs or others to address them with respect to "social,

political, or ideological interests", the Authority is legally prohibited from taking any action in response.

77.    Plaintiffs have no alternate forum to which they can address their grievances. Plaintiffs formerly had the ability to petition the elected City Commission of the City on issues pertaining to GRU – including vital "social, political, or ideological interests". The Special Law eliminates that right and there is no other local elected legislative body with the power to address their grievances.

78.    In addition to the ongoing injury caused by §7.12, the structure of the Special Law guarantees that Plaintiffs cannot petition the Authority – or anyone else – for redress of any grievances in connection with Gainesville Regional Utilities from the date of enactment of the Special Law (July 1, 2023) through the date the Authority members first meet (October 4, 2023). *Compare*, Section 2, §7.07(1) with Section 3. During that intervening period, the City of Gainesville Commission is stripped of its authority, but no Authority members will have been appointed to address resident and consumer concerns. *Compare*, §7.01 ("The Authority… shall be free from direction and control of the Gainesville City Commission.") with §7.07(1) (establishing October 4, 2023 as the date of the first public meeting of the Authority).

79.    Section §7.12 is content-based on its face in two respects:

A.    Section 7.12 allows the Authority to consider only a narrow range of topics in making management and investment decisions. Those permissible topics are defined specifically in terms of their content: "pecuniary factors" which might provide a "fiscal and financial benefit" for their customers.

B.    Section 7.12 specifically censors and prohibits any discussion or consideration of other topics which are also expressly defined in terms of content: "social, political, or ideological interests".

80.    Section 7.12 is viewpoint-based on its face for three reasons:

A.    The Special Law favors and permits speech and ideas pertaining to the finances of the utility system.

B.    The Special Law completely bans and outlaws any speech or ideas which promote other grounds for action, including non-financial social concerns such as objections to particular projects for aesthetic or environmental reasons, promotion of a diverse workforce and economic justice for low-income consumers.

C.    On its face, the Special Law allows speech which denigrates social, political, or ideological interests or suggests that those interests are inappropriate as it only prohibits speech which is in "furtherance" of the disfavored interests.

81.    Section 7.12 infringes upon Plaintiffs' right to petition government for redress of grievances through a content and viewpoint-based censorship scheme. Section 7.12 is against public policy in the State of Florida.[3]

82.    As a content-based and viewpoint-based censorship scheme infringing upon Plaintiffs' right to petition government, §7.12 is subject to strict scrutiny.

83.    Section 7.12 cannot survive strict scrutiny as the law is not supported by a compelling governmental interest, the law does not advance any government interest, and the law does not adopt the least restrictive means of regulation.

84.    Even under intermediate scrutiny, §7.12 is unconstitutional because it is not supported by a substantial government interest, the law does not advance a permissible government interest and the law is not narrowly tailored.

WHEREFORE, Plaintiffs pray for the following relief:

A.    That the Court take jurisdiction over the parties and this cause.

B.    That the Court declare that the Special Law, and §7.12 thereof, violate Plaintiffs' First Amendment right to petition government for the redress of their grievances;

---

[3] *See, e.g.*, "*Public Power Enhances Communities*", Florida Municipal Power Agency, https://fmpa.com/value-of-public-power/ (last accessed 7/2/23) ("Every citizen is a utility owner and can influence decisions that affect their community. Customers of a local utility are encouraged to attend local, public meetings and voice their opinion on discussions that affect their electric bill.").

C.      That the Court enter a preliminary and permanent injunction forever enjoining Defendants and their officers, agents and employees, from enforcing the Special Law, and §7.12 thereof.

D.      That this Court enter a judgment for nominal damages sufficient to compensate the Plaintiffs for the violation of Plaintiffs' right to petition under the First Amendment.

E.      That the Court grant supplemental relief including, but not limited to an award of Plaintiffs' costs and attorney's fees.

F.      That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT II
## FIRST AMENDMENT – FREE SPEECH - CONTENT-BASED AND VIEW-POINT BASED DISCRIMINATION

85.     Plaintiffs reallege the facts set forth in Paragraphs 1 through 3, 5 through 64, 66 and 79 through 80, and incorporate those facts into this Count by reference.

86.     This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against the Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

87.    Plaintiffs are uncertain as to their rights and remedies under the Special Law as that law has been implemented ant applied to Plaintiffs in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

88.    Plaintiffs have the right to speak freely on all matters of public concern that may come before the elected City Commission of the City of Gainesville including all matters pertaining to the operations of GRU, a municipal utility.

89.    Section 7.12 of the Special Law infringes upon Plaintiffs' right of free speech because the Authority is legally precluded from listening to Plaintiffs' grievances on any matters pertaining to "social, political, or ideological interests". Plaintiff alleges the following particulars:

A.    The Special Law provides that meetings of the Authority are to be noticed and open to the public but does not actually state that the public has any right to speak at those meetings.

B.    Public meetings are limited public forums and boards have the right to limit public discussion to agenda items or other matters presently before the board.

C.    Because §7.12 expressly prohibits the Board from considering any "social, political, or ideological interests" in making any "policy and operational decisions". The Board will never have an agenda item pertaining to "social, political, or ideological interests" nor will the Board ever consider or take actions concerning those interests.

D.      As a consequence, §7.12 prohibits Plaintiffs from speaking about any matters pertaining to "social, political, or ideological interests" at any public meeting of the Authority.

E.      To the extent that the public can speak on any topic before the Board, the only topics which the Authority may legally consider are those which "further the fiscal and financial benefit of the Utility System and customers."

90.     Section 7.12 infringes upon Plaintiffs' right of free speech through a content and viewpoint-based censorship scheme.

91.     As a content-based and viewpoint-based censorship scheme infringing upon Plaintiffs' right of free speech, §7.12 is subject to strict scrutiny.

92.     Section 7.12 cannot survive strict scrutiny as the law is not supported by a compelling governmental interest, the law does not advance any government interest, and the law does not adopt the least restrictive means of regulation.

93.     Even if analyzed under intermediate scrutiny, 7.12 is unconstitutional because it is not supported by a substantial government interest, the law does not advance a permissible government interest and the law is not narrowly tailored.

WHEREFORE, Plaintiffs pray for the following relief:

A.      That the Court take jurisdiction over the parties and this cause.

B.      That the Court declare that the Special Law, and §7.12 thereof, violate Plaintiffs' First Amendment right of free speech.

Page 32 of 90

C.     That the Court enter a preliminary and permanent injunction forever enjoining Defendants and their various agents and employees, from enforcing the Special Law, and §7.12 thereof.

D.     That this Court enter a judgment for nominal damages sufficient to compensate the Plaintiffs for the violation of Plaintiffs' free speech rights under the First Amendment.

E.     That the Court grant supplemental relief including, but not limited to an award of Plaintiffs' costs and attorney's fees.

F.     That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT III
## FIRST AMENDMENT – FREE SPEECH – PRIOR RESTRAINT

94.     Plaintiffs reallege the facts set forth in Paragraphs 1 through 3, 5 through 64, 66 and 79 through 80, and incorporate those facts into this Count by reference.

95.     This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against the Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

96.    Plaintiffs are uncertain as to their rights and remedies under the Special Law as that law has been implemented and applied to Plaintiffs in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

97.    Plaintiffs have the right to speak freely on all matters of public concern that may come before their elected officials as well as all matters pertaining to the operations of GRU, their municipal utility.

98.    Section 7.12 of the Special Law imposes an unconstitutional prior restraint upon Plaintiffs' right of free speech because it prescribes in advance the communications which may be addressed by or to the Authority; it prohibits in advance any communications associated with various "social" issues; and it affords undue discretion to the Authority to determine what speech falls into vague content-defined categories and which speech is deemed to "further the fiscal and financial benefit of the Utility System and customers."

99.    As a content-based and viewpoint-based censorship scheme infringing upon Plaintiffs' right of free speech, §7.12 is subject to strict scrutiny.

100.   The restraint imposed by §7.12 is unconstitutional on its face because the Special Law fails to include all of the substantive and procedural safeguards required by FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S.Ct. 596 (1990).

101.    The right of Plaintiffs and other interested persons to petition the Authority and to voice their grievances is dependent upon the unbridled discretion of the Authority. These limitations in §7.12 are completely standardless:

A.      "[S]ocial, political, or ideological interests"

B.      "[F]urther the fiscal and financial benefit of the Utility System and customers."

102.    Section 7.12 unconstitutionally permits the imposition of those content-based and viewpoint-based restrictions on Plaintiffs' speech before any judicial review.

WHEREFORE, Plaintiffs pray for the following relief:

A.      That the Court take jurisdiction over the parties and this cause.

B.      That this Court enter a judgment declaring that §7.12 is unconstitutional on its face and as applied to the Plaintiffs because it imposes a prior restraint without the procedural and substantive protections required by the First Amendment.

C.      That the Court enter a preliminary and permanent injunction forever enjoining Defendants and their officials, agents and employees, from enforcing the Special Law, and §7.12 thereof.

D.      That this Court enter a judgment for nominal damages sufficient to compensate the Plaintiffs for the violation of Plaintiffs' right to petition under the First Amendment.

E.    That the Court grant supplemental relief including, but not limited to an award of Plaintiffs' costs and attorney's fees.

F.    That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT IV
## SECTION 7.12 OF THE SPECIAL LAW IS UNENFORCEABLE BECAUSE IT IS UNCONSTITUTIONALLY VAGUE

103.    Plaintiffs reallege the facts set forth in Paragraphs 1 through 4, 6 through 64, 66 and 79 through 80, and incorporate those facts into this Count by reference.

104.    This is an action for declaratory relief and injunctive relief brought by Plaintiffs against Defendants  under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

105.    Plaintiffs and all other citizens and electors have a constitutional right to petition the elected City Commission of the City of Gainesville for redress of grievances and to speak on any subject including the political, economic, social and ideological policies pertaining to financing, managing, and operating GRU, a municipal utility owned by the people of the City of Gainesville through the City of Gainesville. Those rights include both the actual ability to speak on an issue of concern as well as the right to address those concerns to a representative with the

power to act on it. In other words, Plaintiffs have a First Amendment right of Free Speech as well as a First Amendment right to Petition government for the redress of their grievances.

106.   By its terms, §7.12 prohibits the Authority from considering public comments on matters which are vital to Plaintiffs' interests as well as those of GRU's customers concerning "social, political, or ideological interests".

107.   By its terms, §7.12 prohibits the Authority from taking any action in response to comments from Plaintiffs or other GRU customers citizens and electorate pertaining to "social, political, or ideological interests".

108.   Although §7.12 prohibits some categories of speech and prohibits the Authority from acting in response to certain grievances Plaintiffs and others may present, the language employed is so broad that Plaintiffs cannot ascertain what speech is allowed and what speech is excluded.

109.   Key terms in §7.12 are undefined and none has a commonly accepted definition which alleviates the facial vagueness of the law. Plaintiffs allege the following particulars:

A.    Although §7.12 employs some of the terms which also appear in Ch. 2023-28, 2023 Fla. Sess. Law Serv. (commonly referred to as "HB3"),[4] it does not

_____

[4] HB3 includes a statutory definition of "*pecuniary factor*", a term which is also found in §7.12 of the Special Law:

refer to that new statute and does not expressly incorporate any of its definitions.[5]

B.    In terms of the speech allowed and the scope within which the Authority can operate, §7.12 states that the Authority "shall consider only pecuniary factors and utility industry best practices standards". None of those terms (or any other terms) are defined in the Special Law.   The term "pecuniary" has a commonly understood meaning[6] and, possibly, a statutory definition found elsewhere in Florida law.[7] However, there is no commonly accepted definition "for utility industry best

---

112.662. Investments; exercising shareholder rights

(1)    As used in this section, the term "pecuniary factor" means a factor that the plan administrator, named fiduciary, board, or board of trustees prudently determines is expected to have a material effect on the risk or returns of an investment based on appropriate investment horizons consistent with the investment objectives and funding policy of the retirement system or plan. The term does not include the consideration of the furtherance of any social, political, or ideological interests.

Section 7.12 of the Special Law expressly links the term "*pecuniary factor*" to the term "utility industry best practices". The term "*utility industry best practices*" does not appear anywhere in HB3.

[5] HB3 is a general law establishing new investment policies for the State and its subdivisions. It does not specifically regulate municipal utilities except insofar as those utilities may invest their funds.

[6] *See, e.g.*, "*Pecuniary*", "[C]onsisting of or measured in money [;] of or relating to money" https://www.merriam-webster.com/dictionary/pecuniary    (last    accessed    7/2/23); "*Pecuniary*" "[O]f or relating to money… consisting of or given or exacted in money or monetary payments" https://www.dictionary.com/browse/pecuniary (last accessed 7/2/23).

[7]  *See*, "*Pecuniary factor*" defined in Ch. 2023-28, 2023 Fla. Sess. Law Serv. (HB 3), *supra*.

practices standards" and no reference source known to Plaintiffs prescribes what those standards may be. That phrase or concept is vague in the following respects:

(1)    Section 7.12 purports to include a definition of the phrase "appropriate pecuniary factors and utility industry best practices":

> Appropriate pecuniary factors and utility industry best practices are those which solely further the fiscal and financial benefit of the Utility System and customers.

That description is merely a tautology which defines the phrase in terms of itself. The purported definition provides no meaning or context and is all but nonsensical.

(2)    Although the individual words in this term of art have definitions which are more or less commonly understood,[8] the entire clause must have a specific meaning. Plaintiffs have found no definition of the term "utility industry best practices standards" in any standard dictionary.

(3)    The rules of statutory construction suggest that "utility industry best practices standards" is intended to be restricted to financial matters since the term appears in the same sentence as "pecuniary factors" and the entire

---

[8]  For instance, "best practice" is defined to mean "a procedure that has been shown by research and experience to produce optimal results and that is established or proposed as a standard suitable for widespread adoption." *See*, "Best Practice" https://www.merriam-webster.com/dictionary/best%20practices (last accessed 7/2/23). Similarly, "industry" is defined as "manufacturing activity as a whole" or "a distinct group of productive or profit-making enterprises". *See*, "*Industry*" https://www.merriam-webster.com/dictionary/industry (last accessed 7/2/23).

phrase is defined in those terms. While public utilities engage in commerce to the same degree as other businesses, they are not commonly thought of as being financial institutions, such as banks or hedge funds. In common practice and application, municipal utilities provide a wide range of services and have a dramatic footprint in the communities they serve. The accepted community and public purpose of a municipal utility appears to be in irreconcilable conflict with the notion that operations should be limited strictly to "pecuniary" or "financial" concerns.

(4)     To the extent that "utility industry best practices standards" exist, a review of industry literature suggests that pecuniary concerns are only one factor among many which should guide the industry. Industry literature recommends that community interests such as pollution control, conservation and climate change should guide industry best practices.[9]

---

[9] For example an EPA publication on "Utility Best Practices" states that:

> Improving the energy efficiency of homes, businesses, schools, governments, and industries - which consume more than 70 percent of the natural gas and electricity used in the United States - is one of the most constructive, cost-effective ways to address the challenges of high energy prices, energy security and independence, air pollution, and global climate change.

"Utility Best Practices Guidance for Providing Business Customers with Energy Use and Cost Data" https://www.epa.gov/sites/default/files/2015-08/documents/utility_data_guidance.pdf at 13 (last accessed 7/2/23).

Another best practices guide for the utility industry states:

(5)    Case law suggests that the concept of "industry best practices" is not one which can be understood by laymen, but is reserved for experts and subject to their divergent opinions.[10]

(6)    In sum, the term "appropriate pecuniary factors and utility industry best practices" is unconstitutionally vague – particularly where Plaintiffs' speech and petition rights are at stake.

C.    Section 7. 12 specifically prohibits the Authority from considering any speech or information associated with the "furtherance of social, political, or ideological interests." Each of those terms, singly and in combination, is unconstitutionally vague and afford excessive discretion to the Authority to prohibit public comment, and to ignore public grievances pertaining to the policies and operations of GRU. Plaintiffs allege the following particulars:

---

[T]oday, climate change, national security, and volatility in fuel and commodity markets can make it difficult to determine the best way in which to supply electricity to consumers. Integrated resource planning rules should thus be reexamined periodically, to make sure they reflect the current conditions and challenges associated with providing reliable electric service at reasonable costs.

*Best Practices in Electric Utility Integrated Resource Planning*, Rachel Wilson, Bruce Biewald (2013) available at https://www.raponline.org/wp-content/uploads/2016/05/rapsynapse-wilsonbiewald-bestpracticesinirp-2013-jun-21.pdf (last accessed 7/2/23).

[10] "Expert testimony as to standard practices in an industry is admissible when it is relevant and the expert has demonstrated a basis for the opinion." Regions Bank v. Kaplan, 2017 WL 1148309, at *2 (M.D. Fla. 2017) *citing* United States v. Frazier, 387 F.3d 1244, 1260–61, 1298 (11th Cir. 2004).

(1)    The phrase "furtherance of social, political, or ideological interests" is intended to be a term of art, but it is not defined in §7.12 or in HB3.[11]

(2)    Although the Special Law distinguishes prohibited speech on "social, political, or ideological interests" from permitted speech on "pecuniary factors", the latter phrase has no inherent meaning in the context of the operation of a municipal utility (apart from investing the utility's funds).

(3)    In the context of a municipal utility, "social, political, or ideological interests" necessarily inform a wide range of utility operations ranging from pollution mitigation to the location of infrastructure to the transition to renewable energy. Because there is no specific list of prohibited topics, §7.12 leaves those decisions to the unfettered discretion of the Authority.

(4)    Section 71.2 does not suggest how the Authority or the Plaintiffs can distinguish banned communications which "further" "social, political, or ideological interests"  from permitted discussions on the same topics which do not "further" those interests

(6)    In sum, the term "furtherance of social, political, or ideological interests." is unconstitutionally vague – particularly where Plaintiffs' speech and petition rights are at stake.

---

[11]  The phrase appears multiple times in Ch. 2023-28, 2023 Fla. Sess. Law Serv. (HB 3), *supra* but remains undefined in that general statute.

WHEREFORE Plaintiffs pray for the following relief:

A.    That this Court takes jurisdiction over the parties in this cause.

B.    That this Court determine and declare that the terms "appropriate pecuniary factors and utility industry best practices" and "furtherance of social, political, or ideological interests" are unconstitutionally vague in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

C.    That this Court determine and declare that the terms "appropriate pecuniary factors and utility industry best practices" and "furtherance of social, political, or ideological interests" are not severable from §7.12.

D.    That this Court enter an Order permanently enjoining the Defendants, and its agents and employees, from enforcing the Special Law, and §7.12 thereof, against Plaintiffs or any other similarly situated persons.

E.    That this Court enter a judgment for nominal damages sufficient to compensate the Plaintiffs for the violation of Plaintiffs' rights under the First and Fourteenth Amendments.

F.    That the Court grant supplemental relief including, but not limited to an award of Plaintiffs' costs and attorney's fees.

G.    That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT V

## THE SPECIAL LAW IS INVALID BECAUSE IT VIOLATES ART. III, §11(A), FLA. CONST. BY AFFECTING THE DUTIES OF THE GOVERNOR WHO IS AN OFFICER OF THE STATE

110.    Plaintiffs reallege the facts set forth in Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

111.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86, Fla.Stat. and the Florida Constitution.

112.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

113.    The Special Law is not valid because it is a prohibited special law in violation of Art. III, §11(a) of the Florida Constitution.

114.    Article III, §11(a) of the Florida Constitution, entitled "Prohibited special laws", states:

SECTION 11. Prohibited special laws. —

(a)    There shall be no special law or general law of local application pertaining to:

(1)    election, jurisdiction or **_duties of officers_**, except officers of municipalities, chartered counties, special districts or local governmental agencies;

(Emphasis added.)

115.    The Constitution of the State of Florida is a limitation on the powers of the State, its branches, and officers and not a grant of power. Each word in the Constitution serves to limit power by taking away the authority to change or add to powers stated in the Constitution.

116.    The Governor is an officer of the state. Article IV, §(a) of the Florida Constitution sets forth the powers of the Governor which include the power to "commission all officers *of the state and counties*."    (Emphasis added.) This excludes any power to "commission" or "appoint" officers of municipalities.

117.    Article IV, §(f) of the Florida Constitution gives the Governor the right to "fill by appointment any vacancy *in state or county office* for the remainder of the term of an appointive office. . ."  (Emphasis added). This excludes any power to fill vacancies in municipal offices.

118.    Notably, the Florida Constitution does ***not*** give the Governor the power to appoint "municipal officers" except "[b]y order of the governor any *elected* municipal officer indicted for crime may be suspended from office until acquitted and the office filled by appointment for the period of suspension, not to extend beyond the term, unless these powers are vested elsewhere by law or the municipal charter." Art. IV §7(c), FLA.CONST. (emphasis added).

119.    Additionally, Art. III, §3 of the Florida Constitution provides that the Governor cannot exercise municipal powers stating:

Branches of government.—The powers of the state government shall be divided into legislative, executive and judicial branches. ***No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein***.

(Emphasis added.)

120. The Special Law purports to give the Governor additional "duties" including the following:.

A    Section 7.04(1) of the Special Law provides that "There shall be five members of the Authority ***appointed by the Governor***." (Emphasis added.)

B.    Section 7.04(3) provides that "the composition of the Authority shall be adjusted" based on a ratio of City to non-city customers and provides that the "Governor ***must*** appoint a second member from outside the City boundaries to serve the next term that would otherwise be served by a qualified elector of the City." (Emphasis added.)

C.    Section 7.05(1) provides that the "Governor ***shall*** issue a public notice soliciting citizen nominations for Authority members within 120 days after the effective date of this article." (Emphasis added.)

D.    Section 7.05(2) provides that the "Governor ***shall*** appoint initial members to the Authority from among the nominees within 60 days after the close of the nomination solicitation period."  (Emphasis added.)

E.     Section 7.08(1) gives the Governor authority to oversee the composition of the Authority and states that "*[a] member may be removed or suspended from office by the Governor* in accordance with s. 112.501, Florida Statutes. In addition to the grounds for removal set forth therein, a member may be removed by the Governor for failure to maintain the qualifications specified in section 7.04." (Emphasis added.)

121.   The Special Law violates Art. III, §11(a), FLA.CONST. because it affects the duties of the Governor who is an officer of the State. The Special Law is therefore *ultra vires* and otherwise unlawful.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.     That this Court take jurisdiction over the parties and this cause.

B.     That the Court declare the Special Law to be an invalid special law in violation of Art. III, §11(a), FLA. CONST., and therefore *ultra vires*, null and void *ab initio*.

C.     That the Court issue a preliminary and permanent mandatory injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida.

D.    That the Court issue a preliminary and permanent injunction, enjoining the Defendants, their officers, agents, and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs.

E.    That the Court award Plaintiffs their costs and such other and further relief as the Court deems just.

## COUNT VI
## FAILURE TO COMPLY WITH THE NOTICE REQUIREMENTS OF ART. III, §10, FLA. CONST. AND §11.02, FLA.STAT.

122.    Plaintiffs reallege the facts set forth in Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

123.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86, Fla.Stat. and the Florida Constitution.

124.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

125.    The Special Law is not valid and its passage violated Plaintiffs' due process rights to adequate notice because the published newspaper notice of the bill ("Notice") failed to comply with Art. III, §10, FLA. CONST. and with §11.02, Fla.Stat.

126.   Article III, §10 of the Florida Constitution states:

***No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law***. Such notice shall not be necessary when the law, except the provision for referendum, is conditioned to become effective only upon approval by vote of the electors of the area affected.

(Emphasis added.)

127.   Section 11.02, <u>Fla.Stat.</u> entitled "Notice of special or local legislation or certain relief acts", is the "general law" that implements the constitutional requirement for notice of special laws. Section 11.02 states:

The notice required to obtain special or local legislation or any relief act specified in s. 11.065 shall be by publishing the identical notice as provided in chapter 50 or circulated throughout the county or counties where the matter or thing to be affected by such legislation shall be situated one time at least 30 days before introduction of the proposed law into the Legislature or, if the notice is not published on a publicly accessible website as provided in s. 50.0311 and there is no newspaper circulated throughout or published in the county, by posting for at least 30 days at not fewer than three public places in the county or each of the counties, one of which places shall be at the courthouse in the county or counties where the matter or thing to be affected by such legislation shall be situated. ***Notice of special or local legislation shall state the substance of the contemplated law, as required by s. 10, Art. III of the State Constitution***. Notice of any relief act specified in s. 11.065 shall state the name of the claimant, the nature of the injury or loss for which the claim is made, and the amount of the claim against the affected municipality's revenue-sharing trust fund.

(Emphasis added.)

128.   Section 11.03, <u>Fla.Stat.</u> echoes this provision by requiring that a published notice "stating the substance of a contemplated law" be set forth in an

"Affidavit of proof" filed with the Legislature and "attached to the bill when introduced".

129.   In this case, the invalid Notice was published in the Gainesville Sun on March 9, 2023, March 14, 2023, and March 16, 2023.

130.   The text of the invalid Notice reads as follows:

**NOTICE OF SEEKING APPROVAL OF THE ALACHUA COUNTY LEGISLATIVE DELEGATION OF A LOCAL BILL RELATED TO THE CITY OF GAINESVILLE'S GOVERNANCE OF GAINESVILLE REGIONAL UTILITIES:**

TO WHOM IT MAY CONCERN: Notice is hereby given of the intent of the 2023 Alachua County Legislative Delegation to consider the filing and passage during the 2023 Legislative Session of a local bill whose subject concerns the Gainesville City Commission's governance of Gainesville Regional Utilities. The Delegation will conduct a hearing on the matter, Friday, March 17th, 2023, 11:00AM to 2:00PM in Room 12 of the House Office Building, Florida Capitol, 402 South Monroe Street, Tallahassee Florida, 32399-1300. 8554009  3/9, 3/14, 3/16/2023

131.   The original bill HB 1645 was filed on April 10, 2023, which was ten days after the invalid Notice was first published.  A copy of the original bill is attached as Exhibit "2" to this Complaint.

132.   The content of the original bill (HB 1645) was substantially different from the law that was finally enacted as the Special Law (CS/HB 1645).  The original

version of HB 1645 was five (5) pages long and comprised of three substantive provisions taken from a 2017 special law (HB 759), where the term "city commission" was simply replaced with the term "Governor."

133.    The original bill (HB 1645) was substantially amended by a proposed committee substitute bill (PCS/HB 1645), that passed by the House on April 27, 2023, passed by the Senate on May 4, 2023, and was enacted as CS/HB 1645, *i.e.* the Special Law. The final version of the bill was fourteen (14) pages long and contained twelve (12) substantive provisions, most of which were not in the original bill that was the subject of the invalid published Notice.

134.    The House of Representatives Local Bill Staff Analysis on CS/HB 1645, the Special Law, sets forth what the legislative staff thought the bill accomplished:

> The bill amends the City charter to establish the Gainesville Regional Utilities Authority (Authority) to govern GRU. The bill details the Authority's governance and leadership structure, as well as duties and powers. In summary, the bill:
>
> ●    Establishes the Authority as a unit of city government, free from the direction and control of the City commission and City charter officers, for the purpose of governing the utilities operated by GRU.
>
> ●    Establishes the powers and duties of the Authority.
>
> ●    Provides that the Authority will consist of five members appointed by the Governor, to include at least one member from outside the City boundaries, serving four-year terms.

- Sets qualification requirements for Authority members and provides for a citizen nomination solicitation process.

- Provides that an Authority member may be removed or suspended by the Governor for cause under general law.

- Provides for the continued service of GRU personnel under the chief executive officer/general manager (CEO/GM).

- Requires the performance of all acts necessary to ensure an orderly transition of GRU governance to the Authority.

- Limits transfers from the utility fund to the City to the aggregate of utility system net revenues less the flow of funds and requires any remaining funds after the transfer to be dedicated to additional debt service or used as equity for future capital projects.

- Requires the Authority and CEO/GM to the make all policy and operational decisions for the utility based only on pecuniary factors and utility industry best practices.

- Repeals section 3.06 of the current City charter relating to the general manager for utilities.

A copy of the staff memorandum on the final version of the Special Law is attached as Exhibit "3" to this Complaint.

135.   The substance of the bill as analyzed by the legislative staff is entirely different from the invalid published Notice.

136.   The Notice is legally insufficient because it does not provide the citizens of Gainesville and the customers of GRU with notice of the "substance of the contemplated law" as required by Art. III, §10, FLA. CONST. and § 11.02 Fla.Stat.

137.   The published Notice does not state that the "substance" of the law is to transfer all power of the elected City Commission of the City of Gainesville pertaining to the governance and operation of GRU to a Board appointed by the Governor. Instead, the Notice refers to a "local bill" that "***concerns*** the Gainesville City Commission's governance of the Gainesville Regional Utilities" and nothing more.  (Emphasis added.)

138.   The Notice does not identify the substance of the "concerns" in the bill.

139.   The Notice does not state or even suggest that the substance is to end the authority of the elected Gainesville Commission to govern its municipally owned utility system and to transfer governance and effective ownership to the Authority governed by a board appointed by and answerable only to the Governor, an executive of the State of Florida, and not to the elected City Commission of the City of Gainesville.

140.   The Notice does not provide notice that the new Authority could limit the transfer of funds from the Authority to the City of Gainesville's general revenue fund, which has been as much as $38,000,000.00 per year. It also does not notify citizens that the Special Law would likely result in higher ad valorem taxes in the City of Gainesville by denying the elected City Commission the control of its assets, thus requiring the City Commission to raise ad valorem taxes or to reduce the level of municipal services or both.

141.   The Notice also does not provide notice that the Authority would have control over the rates charged for all local utilities, *i.e.*, electricity, water, sewer, gas, and telecommunications.

142.   The Notice does not provide the public notice that the Special Law as enacted would include a provision governing speech rights and the right of petition:

> 7.12   Limitation on utility directives.-The Authority and the CEO/GM, in making all policy and operational decisions over the affairs of the utility system as contemplated under the provisions of this act, shall consider only pecuniary factors and utility industry best practices standards, **which do not include consideration of the furtherance of social, political, or ideological interests**.

(Emphasis added); *See*, §7.12 addressed in Counts I, II, III and IV, *supra*.

143.   The notice does not provide the public notice that the Special Law as enacted would include a "directive" that takes away the power of the Authority to consider the social and economic needs of the citizens of the City of Gainesville and of other users in setting rates. This focus and discretion has long been exercised by the City of Gainesville and other public utilities.

144.   The Notice does not inform the public or affected municipal employees that their new "boss" would be the chief executive officer and general manager ("CEO/GM"), appointed by and answerable to an unelected Authority, or that this person would have the exclusive authority to hire, transfer, promote, discipline, or terminate existing GRU employees.

145.    The Notice does not inform the public that the Authority would wield unique operational powers, independent of the elected City Commission, in a scheme unprecedented in Florida or, to Plaintiffs' best knowledge and belief, anywhere else in the United States.

146.    In total, the Notice fails to notify the citizens of the City of Gainesville and the customers of GRU of the actual "substance" of the Special Law as enacted and the gravity of the consequences of its adoption.

147.    In addition, the notice does not comply with the requirements of the Rules of the Florida House of Representatives on notice of special bills. The Rules state as follows:

II.3.    SUBSTANCE INCLUDED IN THE NOTICE

The substance of a proposed local bill must be summarized in the advertised notice. ***The notice must include all matters contained in the body of the proposed legislation***, although the specific contents need not be listed in detail. The notice must provide reasonable notice to a person whose interests may be directly affected by the proposed legislation so that person may inquire further into the details of the local bill and, if desired, seek to prevent enactment or persuade the Legislature to change the substance of the proposed bill.

(Emphasis added.)

148.    The Notice fails to include "all matters contained in the body of the proposed legislation."

149.  In addition to the statutory notice requirements, the House imposes additional enactment requirements, including a specific provision specifying the venue of any public hearing:

I.4.  LOCAL BILL FILING PROCESS IN THE HOUSE

Although the public hearing is not required by law, House policy requires all proposed local bills to be heard by the local legislative delegation *at a public hearing in the area that would be subject to the legislation*.

(Emphasis added.)

150.  The public hearing on the proposed bill was not held in Gainesville or Alachua County where the citizens of Gainesville and the GRU customers live; rather it was conducted in Tallahassee.

151.  The title of the original bill HB 1645 stated:

A bill to be entitled

An act relating to the City of Gainesville, Alachua County; amending chapter 12760, Laws of Florida (1927), as amended by chapter 2017-200, Laws of Florida; providing that members of the Gainesville Regional Utilities Authority be appointed by the Governor, rather than the City Commission of the City of Gainesville; providing for initial appointments; conforming provisions; providing an effective date.

152.  Section 1 of the original bill stated:

Section 1. Subsections (1) and (3) of section 7.04 and 14 sections 7.05 and 7.08 of Article VII of chapter 12760, Laws of 15 Florida (1927), as amended by chapter 2017-200, Laws of Florida, are amended to read: (etc.) ....

153.   In contrast, the title of the Special Law as enacted stated:

An act relating to the City of Gainesville, Alachua County; amending chapter 12760, Laws of Florida (1927), as amended by chapter 90-394, Laws of Florida, relating to the City's charter; repealing section 3.06 of the charter, relating to the general manager for utilities of Gainesville Regional Utilities; creating the Gainesville Regional Utilities Authority and establishing it as the governing board of Gainesville Regional Utilities; providing an effective date.

154.   Section 1 of the bill as finally enacted stated:

Section 1. Section 3.06 of Article III of section 1 of 15 chapter 90-394, Laws of Florida, is repealed. 16 Section 2. Article VII is added to chapter 12760, Laws of Florida (1927), as amended by chapter 90-394, Laws of Florida, to read: …

155.   Notice was never given of the substantive amendments to the bill which took place through the legislative process. The title and substance of the bill as enacted were never published prior to enactment or enrollment.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.   That this Court take jurisdiction over the parties and this cause.

B.   That the Court declare the Special Law to be an invalid special law in violation of Art. III, §11(a), FLA. CONST. and §11.02 Fla.Stat., and  therefore *ultra vires*, null and void *ab initio*;

C.   That the Court issue a preliminary and permanent mandatory injunction, enjoining the Defendant CORD BYRD, in his official capacity as

Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida, and

D.    That the Court issue a preliminary and permanent injunction, enjoining the Defendants, their agents, servants and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs;

E.    That the Court award Plaintiffs their costs and such other and further relief as the Court deems just.

## COUNT VII
## FAILURE TO COMPLY WITH THE AFFIDAVIT REQUIREMENTS OF SECTION 11.03, FLORIDA STATUTES

156.   Plaintiffs reallege the facts set forth in Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

157.   This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86, Fla.Stat. and the Florida Constitution.

158.   This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

159.   The Special Law is not valid and its passage violated Plaintiffs' due process rights to adequate notice because the affidavit of publication of notice does not comport with the requirements of §11.03, Fla.Stat.

160.   The affidavit of publishing the Notice filed with the Legislature is attached as Exhibit "4" to this Complaint.

161.   In order for a special law to be valid, it must be accompanied by an affidavit in proper form which attests to the publication of notice to the public of the title and particulars of the propose special law. In particular, §11.03(2) Fla.Stat. requires:

> ***Such affidavit of proof of publication shall be attached to the contemplated law when it is introduced into the Legislature***. A true copy of the notice published or posted shall also be attached to the bill when introduced, but it shall not be necessary to enter said published or posted notice, or proof thereof, in the journals. The fact that such notice was established in the Legislature shall in every case be recited upon the journals of the Senate and of the House of Representatives, and the notice published and affidavit of publication thereof shall accompany the bill throughout the Legislature and be preserved as a part thereof in the Department of State.

(Emphasis added.)

162.   Plaintiffs have found no evidence that the affidavit of proof of publication was "attached" to the original bill (HB 1645) when it was filed with the Legislature.

163.    The affidavit of proof of publication was not properly notarized, and that failure constitutes an additional and alternative basis for concluding that the Special Law was not properly noticed or enacted

164.    In Florida, a valid affidavit must satisfy the following statutory criteria:

Section 92.50. Oaths, affidavits, and acknowledgments; who may take or administer; requirements

(1)    In this state. - Oaths, affidavits, and acknowledgments required or authorized under the laws of this state (except oaths to jurors and witnesses in court and such other oaths, affidavits and acknowledgments as are required by law to be taken or administered by or before particular officers) may be taken or administered by or before any... notary public within this state. The jurat, or certificate of proof or acknowledgment, shall be authenticated by the signature and official seal of such officer or person taking or administering the same; ...

(2)    In other states, territories, and districts of the United States. -Oaths, affidavits, and acknowledgments required or authorized under the laws of this state, may be taken or administered in any other state...by or before any notary public or justice of the peace, having a seal, in such state, territory, or district; provided, however, such officer or person is authorized under the laws of such state, territory, or district to take or administer oaths, affidavits and acknowledgments. The jurat, or certificate of proof or acknowledgment, shall be authenticated by the signature and official seal of such officer or person taking or administering the same; ...

165.    The content of the required jurat is prescribed by §117.05, Fla.Stat.

166.    The affidavit associated with the enactment of the Special Law includes almost none of the information required by statute.

167.    Section 117.05, <u>Fla.Stat.</u> requires the affidavit to state: "The name of the person whose signature is being notarized."

168.    The affidavit of publication in this instance fails to identify the affiant. In particular, the affiant's name is not clearly set forth but is a wholly illegible scribble which may or may not be the affiant's name. Without the identification of the affiant in the affidavit, that scribble does not meet the statutory requirement for a valid affidavit in Florida.

169.    Section 117.05, <u>Fla.Stat.</u> requires that:

(5)    A notary public may not notarize a signature on a document unless he or she personally knows, or has satisfactory evidence, that the person whose signature is to be notarized is the individual who is described in and who is executing the instrument. A notary public shall certify in the certificate of acknowledgment or jurat the type of identification, either based on personal knowledge or other form of identification, upon which the notary public is relying.

170.    The affidavit is legally invalid because it does not certify how or whether the notary confirmed the identity of the affiant.

171.    Section 117.05, <u>Fla.Stat.</u> requires an affidavit to identify where the instrument was signed.

172.    This affidavit does not identify where it was signed but includes two inconsistent statements that relate to location: the jurat heading, "State of Florida, County of Alachua," and the line under the notary's signature stating "'Notary, State of WI County of Brown."

173.    The jurat of the affidavit states that it was notarized by "Kaitlyn Felty, Notary Public, State of Wisconsin." If the affidavit was executed in Florida, which the jurat suggests, it is invalid because a notary public commissioned in Wisconsin is not authorized to notarize documents in Florida (unless also commissioned in Florida). The affidavit does not so state. This alone is a fatal defect in the affidavit.

174.    If the affidavit was executed in Wisconsin, it would be valid only if the affiant appeared before the notary in Wisconsin, which the affidavit does not certify.

174.    The failure of the affidavit to certify where it was executed, as required by law, is a fatal defect.

175.    The Special Law was adopted without strict compliance with Art. III, §10, and §11.03, Fla.Stat., as the affidavit of publication was not properly witnessed by a notary as required by Florida law and is thus *ultra vires* and otherwise unlawful.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.    That this Court take jurisdiction over the parties and this cause

B.    That this Court declare the Special Law to be invalid because it was invalidly adopted in violation of Art. III, §10, FLA. CONST. and §11.03, Fla.Stat., in that the required proof of publication failed to comply with statutory requirements for notarization, and is therefore null and void *ab initio*;

C.    That the Court issue a preliminary and permanent mandatory injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida, and

D.    That the Court issue a preliminary and permanent injunction enjoining the Defendants, and their officers, agents, and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs;

E.    That the Court award Plaintiffs their costs and such other and further relief as the Court deems just.

## COUNT VIII
## THE SPECIAL LAW VIOLATES ART. VIII, §2(B), FLA.CONST. BECAUSE IT AUTHORIZES AN UNELECTED, NON-LEGISLATIVE AUTHORITY TO MAKE  LEGISLATIVE DECISIONS FOR A MUNICIPALITY

176.    Plaintiffs reallege the facts set forth in  Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

177.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86,  Fla.Stat. and the Florida Constitution.

178.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

179.    The Special Law transfers all the powers and authority to make policies, govern, and operate GRU, a municipal utility system owned by the people of the City of Gainesville through the elected City Commission of the City of Gainesville to the unelected Board of the Authority, whose members are appointed and removed only by the Governor, who is not an elected municipal official, and is barred by Art. III, §2, FLA.CONST. from exercising any legislative powers.

180.    Article VIII §2 Florida Constitution provides

SECTION 2. Municipalities.

    (a)    ESTABLISHMENT. Municipalities may be established or abolished and their charters amended pursuant to general or special law. When any municipality is abolished, provision shall be made for the protection of its creditors.

    (b)    POWERS. Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law. Each municipal legislative body shall be elective.

    (c)    ANNEXATION. Municipal annexation of unincorporated territory, merger of municipalities, and exercise of extra-territorial powers by municipalities shall be as provided by general or special law.

181.    Setting utility rates is a legislative function.

182.   Adopting ordinances to issue municipal bonds is a legislative function.

183.   Adopting ordinances to exercise extra-territorial powers is a legislative function.

184.   The Special Law invalidly authorizes the unelected Board of the Authority to exercise the forgoing and other legislative powers in violation of Art. VIII, §2(B), FLA.CONST. which provides that all municipal legislative decisions must be made by *elected* municipal officers.

185.   Because transferring all powers to make policies for, govern and operate GRU is the function of the Special Law, the Special Law violates Art. VIII, §2, FLA.CONST. and is invalid and void *ab initio*.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.   That this Court take jurisdiction over the parties and this cause

B.   That this Court declare the Special Law to be invalid because it violates Article VIII §2(b) Florida Constitution by authorizing a non-elected, non-legislative board to exercise the legislative powers of a municipal government.

C.   That this Court issue a preliminary and permanent injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida

which incorporate the Special Law, from the official records of the State of Florida, and

D.     That this Court issue a preliminary and permanent injunction, enjoining the Defendants, and their officers, agents, servants and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs;

E.     That this Court award costs and such other and further relief as it deems just.

## COUNT IX
## THE SPECIAL VIOLATES ART. III, §10, FLA.CONST. BECAUSE NO VALID NOTICE WAS PUBLISHED AND BECAUSE THE SPECIAL LAW DOES NOT PROVIDE FOR A REFERENDUM

186.   Plaintiffs reallege the facts set forth in Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

187.   This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86,  Fla.Stat. and the Florida Constitution.

188.   This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

189.   Article III, §10 of the Florida Constitution provides:

SECTION 10. Special laws.—No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law. Such notice shall not be necessary when the law, except the provision for referendum, is conditioned to become effective only upon approval by vote of the electors of the area affected.

190.   The Special Law does not require that a referendum on the special law be held "by vote of the electors of the area affected."

191.   The notice provided was legally invalid and nugatory under Florida law.   191.   Because the Special Law was not validly noticed and does not provide for a referendum of the people in the affected area, the Special Law was enacted in violation of Art. III, §10, FLA.CONST. and is void *ab initio*.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.   That this Court take jurisdiction over the parties and this cause

B.   That this Court declare the Special Law to be invalid because it violates Art. III, §10, FLA.CONST. because it was not validly noticed as required by the Florida Constitution and provides for no referendum for the "approval by vote of the electors of the area affected."

C.   That, in the alternative, this Court declare that the Authority Board may not be appointed and the Special Law may not be enforced until such time as it is approved by the electors through a properly-noticed and conducted referendum.

D.     That this Court issue a preliminary and permanent injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida.

E      That this Court issue a preliminary and permanent injunction, enjoining the Defendants, and their officers, agents, servants and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs.

F.     That  this Court award Plaintiffs their costs and such further relief as this Court deems just.

## COUNT X
## THE SPECIAL LAW IS UNENFORCEABLE
## BECAUSE IT FAILS TO PROVIDE FOR A REFERENDUM BY THE
## ELECTORATE OF THE CITY OF GAINESVILLE AS REQUIRED BY
## §166.021(4), FLA.STAT.

192.   Plaintiffs reallege the facts set forth in Paragraphs 1 through 4 and 6 through 62, and incorporate those facts into this Count by reference.

193.   This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86,  Fla.Stat. and the Florida Constitution.

194.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

195.    The Special Act is not valid because it affects the "exercise of extraterritorial powers" and affects the "rights of municipal employees" but failed to provide for a referendum as required by Florida Law.

196.    Section 166.021(4), <u>Fla.Stat.</u> provides as follows:

The provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the constitution. It is the further intent of the Legislature to extend to municipalities the exercise of powers for municipal governmental, corporate, or proprietary purposes not expressly prohibited by the constitution, general or special law, or county charter and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited. However, ***nothing in this act shall be construed to permit any changes in a special law or municipal charter which affect the exercise of extraterritorial powers*** or which affect an area which includes lands within and without a municipality or any changes in a special law or municipal charter which affect the creation or existence of a municipality, the terms of elected officers and the manner of their election except for the selection of election dates and qualifying periods for candidates and for changes in terms of office necessitated by such changes in election dates, the distribution of powers among elected officers, matters prescribed by the charter relating to appointive boards, any change in the form of government, ***or any rights of municipal employees***, without approval by referendum of the electors as provided in s. 166.031. Any other limitation of power upon any municipality contained in any municipal charter enacted or adopted prior to July 1, 1973, is hereby nullified and repealed.

(Emphasis added).

197.   Nowhere in the Special Law is there any suggestion that the referendum requirement imposed by general law has been waived in connection with the Special Law. In fact, the Special Law does not include the word "referendum" or address the subject in any way.

198.   As a result, the Special Law does not conflict with or supersede the §166.021(4), Fla.Stat. (i.e. general law) requirement for a referendum in these circumstances.

199.   GRU's service area extends beyond the municipal limits of the City of Gainesville. The Special Law acknowledges this fact:

> The composition of the Authority shall be adjusted upon expiration of any member's term, or upon any Authority vacancy, to reflect the ratio of total electric meters serving GRU electric customers ***outside the City's jurisdictional boundaries*** to total electric meters serving all GRU electric customers.

*See*, §7.04(3) (Emphasis added.)

200.   As set forth above, the Authority's broad exercise of power over municipal public works includes areas outside of the jurisdictional borders of the City. Because the Special Law affects "extraterritorial powers", it should have provided for a referendum under §166.021(4), Fla.Stat.

201.  The Special Law also affects the rights of existing and future "municipal employees", including Plaintiff VARVEL.

202.   Section 7.09 of the Special Law is entitled "Management and personnel" and provides as follows:

A chief executive officer/general manager (CEO/GM) shall direct and administer all utility functions, subject to the rules and resolutions of the Authority. The CEO/GM shall serve at the pleasure of the Authority. Appointment or removal of the CEO/GM shall be by majority vote of the Authority. Until such time as the Authority appoints a CEO/GM, the sitting general manager of GRU shall serve as the CEO/GM. A sitting member of the Authority may not be selected as the CEO/GM.

*All officers and employees of the City* who serve under the supervision and direction of the sitting general manager of GRU *shall serve under* the CEO/GM. *The CEO/GM shall have the exclusive authority to hire, transfer, promote, discipline, or terminate employees* under his or her supervision and direction.

The Authority shall fix the salary of the CEO/GM, and the CEO/GM *shall fix the salaries of all other employees* who serve under his or her direction consistent with the annual budget approved by the Authority. The sitting general manager of GRU, as well as all officers and employees of the City who, by virtue of this article, become subject to the supervision and direction of the CEO/GM, shall continue without any loss of rights or benefits as employees under the pension plans and civil service merit system of the City existing as of the creation of the Authority.

(Emphasis added.)

203.   Thus, because the Special Law affects the rights of "municipal employees", the Special Law should have provided for a referendum under §166.021(4), Fla.Stat.

204.   The right of the electorate to vote on the amendment to their charter is especially important when it involves something as critical and important as their utilities. Under the Special Law, the type of "utilities" that the Authority is empowered to govern is broad.  The definition of utilities in the Special Law states as follows:

> "Utilities" means the electric utility system, water utility system, wastewater utility system, reuse water utility system, natural gas utility system, communications utility system, and such other utility systems as may be acquired by GRU in the future.

205.   Section 166.031, Fla.Stat. governs municipal charter amendments and requires a referendum to amend a municipal charter in these circumstances.

206.   The Special Law is invalid to amend the charter of the City of Gainesville, including affecting the "exercise of extraterritorial powers" and the "rights of municipal employees" because it does not provide for approval in a referendum by the electorate of the City of Gainesville.

207.   It is telling that the last time the Legislature tried to take GRU from the City, it proposed a bill that actually required a referendum.

208.   In 2017, the same local representative who put forth the Special Law proposed House Bill No. HB 759 which, like the current proposal, would transfer the City's utility system to an Authority. However, in the 2017 bill, the Authority was actually "appointed by a majority vote of the city commission." Unlike the

current bill, in 2017 the Legislature included a provision in the law for a referendum vote of the electors of Gainesville to approve the transfer of GRU to the Authority.

HB 759 provided in part as follows:

> Section 4.    Referendum At the special referendum election called pursuant to this act, the ballot question shall read as follows:
>
>> "Shall the Charter of the City of Gainesville be amended to create the Gainesville Regional Utilities Authority as the governing board of Gainesville Regional Utilities (GRU), whose responsibilities shall include, but not be limited to, examining and establishing utility rates for all customers? Board members shall be GRU customers, shall be diverse and representative of the community, and shall be nominated by citizens and appointed by the Gainesville City Commission."
>
>> Yes  _____
>
>> No   _____
>
> Section 5.    This act shall take effect only upon its approval by a majority vote of those qualified electors of the City of Gainesville voting in a referendum to be held in November 2018 in conjunction with the general election to be held in the City of Gainesville, except that this section and section 4 shall take effect upon becoming a law.

A copy of HB 759 is attached as Exhibit 5 to this Complaint

209.    HB 759 failed; nearly 60% of the voters rejected the proposed amendment to the Charter to give away their utility to separate utility authority.

210.    Because the notice and enactment procedure were invalid for the multiple reasons discussed in Counts VI, VII, VIII and IX, the failure to provide for a referendum dooms the Special Law.

WHEREFORE, Plaintiffs pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.    That this Court take jurisdiction over the parties and this cause.

B.    That this Court declare the Special Law to be invalid because it affects extraterritorial areas and municipal employees and does not include a requirement for a referendum in violation of §166.021(4), Fla.Stat. and is therefore null and void *ab initio*.

C.    That this Court declare the Special Law to be invalid because the notice for the Special Law was inadequate and there was no referendum – a failure which renders therefore the Special Law null and void *ab initio* under Article III, Section 10 of the Florida Constitution.

D.    That, in the alternative, this Court declare that the Authority Board may not be appointed and the Special Law may not be enforced until such time as it is approved by the electors through a properly-noticed and conducted referendum.

E.    That this Court issue a preliminary and permanent injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the

State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida.

F.    That this Court issue a preliminary and permanent injunction, enjoining the Defendants, their officers, agents, and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs;

G.    That  this Court award Plaintiffs their costs and such other and further relief as this Court deems just.

## COUNT XI
## THE SPECIAL LAW DIMINISHES THE RIGHT TO VOTE ON MUNICIPAL LEGISLATIVE OFFICES THAT IS GUARANTEED BY ART. VIII §2(b) FLA.CONST.

211.   Plaintiffs WHEELER, BOTTCHER, FOXX and LITTLE reallege the facts set forth in Paragraphs 1 through 4 and 6 through 63, and incorporate those facts into this Count by reference.

212.   This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86,  Fla.Stat. and the Florida Constitution.

213.   This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

214.   This is an action to invalidate the Special Law on the grounds that it violates Plaintiffs' right to vote protected by the Florida Constitution.

215.   The Florida Supreme Court has long held that the right to vote for those representatives constituting our government is fundamental and protected under both the federal and state Constitutions:

> Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard.

Boardman v. Esteva, 323 So.2d 259, 263 (Fla. 1975).

216.   Article VIII §2 of the Florida Constitution guarantees municipal electors the right to vote for municipal legislative officers.

217.   Article V §2 Florida Constitution prescribes the qualifications for electors as follows;

> SECTION 2. Electors.—Only a citizen of the United States who is at least eighteen years of age and who is a permanent resident of the state, if registered as provided by law, shall be an elector of the county where registered.

218.   Section 97.041, <u>Fla.Stat.</u> specifies the qualifications for those entitled
to vote:

97.041 Qualifications to register or vote.—

(1)(a) A person may become a registered voter only if that person:

      1.      Is at least 18 years of age;

      2.      Is a citizen of the United States;

      3.      Is a legal resident of the State of Florida;

      4.      Is a legal resident of the county in which that person
seeks to be registered; and

      5.      Registers pursuant to the Florida Election Code.

      (b)    A person who is otherwise qualified may preregister on or
after that person's 16th birthday and may vote in any election occurring
on or after that person's 18th birthday.

(2)    The following persons, who might be otherwise qualified, are not
entitled to register or vote:

      (a) A person who has been adjudicated mentally incapacitated
with respect to voting in this or any other state and who has not had his
or her right to vote restored pursuant to law.

      (b)    A person who has been convicted of any felony by any
court of record and who has not had his or her right to vote restored
pursuant to law.

(3)    A person who is not registered may not vote.

219.   Section 166.032 Florida Statutes provides:

Electors.—Any person who is a resident of a municipality, who has qualified as an elector of this state, and who registers in the manner prescribed by general law and ordinance of the municipality shall be a qualified elector of the municipality.

220.   Section 9-13 of the Charter Laws of the City of Gainesville, Florida prescribes the qualification of electors of the City of Gainesville as follows:

Electors in the city shall have the qualifications as set forth in F.S. §§ 97.041 and 166.032.

221.   Plaintiffs WHEELER, BOTTCHER, FOXX and LITTLE are residents and electors of the City of Gainesville, Florida and possess the qualifications prescribed by Art. V, §2, FLA.CONST., the Gainesville Charter Laws and §§97.041 and 166.032, Fla. Stat.

222.   Plaintiffs WHEELER, BOTTCHER, FOXX and LITTLE have regularly voted in elections for Gainesville legislative officials for many years and presently intend to continue to do so.

223.   Municipal governance of GRU by the elected City Commission of the City of Gainesville includes making legislative decisions and taking legislative action about, *inter alia*, setting of utility rates, adopting bond ordinances to finance the utility and others requiring the adoption of ordinances.

224.   Under the law of Florida a municipality that owns and operates a municipal utility system has the power to earn a reasonable income on the ownership and operation of the municipal utility system and to use the earned income to provide

general government service for city residents and all others who use the municipality's facilities.

225.   The City of Gainesville annually earns a reasonable income of several tens of millions of dollars on the operation of GRU.

226.   The City of Gainesville employs GRU earnings to provide municipal services, including but not limited to, parks and recreation, health and safety streets, roads and street-lighting, and housing for poor, for the benefit of the residents of the City of Gainesville.

227.   The Special Law removes the power of the elected legislative body of the City of Gainesville to control the amount of money available to the City's general government to provide general governmental services to the residents of the municipality and transfers that power to the unelected appointed authority that is not answerable to the electorate of the City of Gainesville.

228.   Pursuant to Art. VIII, §2, FLA.CONST. Plaintiffs have the constitutional right to vote for or against, and to recall, members of the elected City Commission of the City of Gainesville and to consider the decisions made by existing Members and the positions taken by candidates for election to the City Commission on legislative matters pertaining to the legislative governance of GRU.

229.   The Florida Declaration of Rights, and in particular, FLA.CONST. Art. I, §§1, 4 and 5 also secure the right of the people to vote and to exercise political

power as the ultimate sovereign: "All political power is inherent in the people." Id. at §1.

230.   In Florida, setting utility rates is a legislative function.

231.   In Florida, adopting municipal ordinances, including bond ordinances, is a legislative function.

232.   The Special Law transfers all the power and authority to the City Commission of the City of Gainesville to govern, including setting rates and adopting bond ordinances, manage and operate GRU, leaving only bare title ownership of GRU's properties in the City of Gainesville. The Special Law further transfers all governing powers, including the power to adopt utility rates and issue bonds, to a non-elected Board whose members are appointed by the Governor of Florida and answerable only to the Governor of Florida.

233.   The Special Law mandates that some members of the unelected Board **not** be residents and electors of the City of Gainesville.

234.   The Governor of Florida is an executive official of the State of Florida who has no legislative power or authority, and can have no legislative power or authority, pertaining to the governance of municipalities beyond suspending municipal officers indicted for crime. Article II, §3 of the Florida Constitution sets those limitations:

SECTION 3. Branches of government.—The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.

235.   The Florida Constitution provides the Governor of Florida no authority to appoint governing boards of municipalities.

236.   The Special Law applies only to the City of Gainesville, leaving the powers of the remaining 400-plus Florida municipalities in place.

237.   The legislature had a partisan political purpose to enact the Special Law that applies only to the City of Gainesville.

238.   The legislature's partisan political purpose was to remove the power of the elected legislative body of the City of Gainesville to determine the portion of GRU's earnings, if any, that the elected legislative body of the City of Gainesville can use to provide municipal services within the city.

239.   A result of eliminating or reducing the amount of GRU's earnings employed to provide municipal services will be to reduce the level of municipal services provided to residents of and visitors to the city, or to raise the amount of ad valorem taxes paid by owners of property in the City, especially residential property owners, or to require users of municipal services to pay fees for services, or all of the above.

240.   Eliminating or reducing the amount of GRU's earnings employed to provide municipal services within the City of Gainesville will have a disproportionate impact upon lower income residents and residents of the City's historically black neighborhoods.

241.   The Special Law deprives the Plaintiffs of the right to vote for the body that makes legislative decisions pertaining to the governance of GRU, a municipal utility owned by the City of Gainesville.

242.   The Special Act impugns, deprives or interferes with the Plaintiffs' rights under the Florida Constitution to vote for the elective body of the City of Gainesville as applied to governance of GRU.

243.   The Special Law deprives Plaintiffs of the right to vote that is guaranteed by Art. VIII, §2(b), FLA.CONST.

WHEREFORE, Plaintiffs WHEELER, BOTTCHER, FOXX and LITTLE pray for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.    That this Court take jurisdiction over the parties and this cause.

B.    That this Court declare the Special Law to be invalid because it violates Art. VIII, §2, FLA.CONST. and the Florida Declaration of Rights because it substantially deprives Plaintiffs of their right to vote in municipal elections or dilutes

that vote so that Plaintiffs cannot effectively exercise the franchise in connection with matters vital to the municipal government.

C.    That this Court issue a preliminary and permanent injunction, enjoining the Defendant CORD BYRD, in his official capacity as Secretary of State of the State of Florida to expunge and remove the Special Law and all Laws of Florida which incorporate the Special Law, from the official records of the State of Florida.

D.    That this Court issue a preliminary and permanent injunction, enjoining the Defendants, and their officers, agents, servants and employees and others acting in concert with, or under the direction and control of Defendants, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiffs WHEELER, BOTTCHER and LITTLE and all other similarly situated electors.

E.    That  this Court award Plaintiffs their costs and such other and further relief as this Court deems just.

## COUNT XII
## THE SPECIAL LAW IMPAIRS LITTLE'S BOND CONTRACT

244.   Plaintiff JOSEPH W. LITTLE reallege the facts set forth in Paragraphs 1 through 4, 6 through 8, 31 through 55 and 63, and incorporate those facts into this Count by reference.

245.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86, Fla.Stat. and the Florida Constitution brought only by Plaintiff JOSEPH W. LITTLE against Defendant CITY OF GAINESVILLE.

246.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

247.    LITTLE is the owner and holder of a municipal bond connected with the financing of GRU; to-wit: a 2017 Series A bond CUSIP 362848UH4, with a maturity date of October 1, 2035, and an original face amount of $5,000.00.

248.    The terms of LITTLE's bond are subject to the Official Statement dated October 25, 2017, governing the issuance of $415,920,000 City of Gainesville, Florida, Utilities System Revenue Bonds, 2017 Series A ("Official Statement"). A copy of the Official Statement is attached as Exhibit "6" to this Complaint.

249.    The Official Statement is recognized under Rule 817, Fed.R.Evid. as an exception to hearsay, a such Statements are recognized by the economic market in general, and are relied upon by millions of people for investment and security purposes. They are governed by Federal Securities law.

250.    Article I, §10, of the Florida Constitution provides as follows:

SECTION 10.    Prohibited laws.—No bill of attainder, ex post facto law *or law impairing the obligation of contracts shall be passed*.
(Emphasis added.)

251.    The Special Law impairs LITTLE's contractual rights in the GRU bond issued to him by the City of Gainesville.

252.    Section 7.03(1)(e) of the Special Law provides the Authority with the "Powers and duties" to:

> (e)    **To authorize the issuance of revenue bonds and other evidences of indebtedness of the City, secured by the revenues and other pledged funds and accounts of the utility system**, pursuant to Florida law. Upon resolution of the Authority establishing the authorized form, terms, and purpose of such bonds, for the purpose of financing or refinancing utility system projects, **and to exercise all powers in connection with the authorization of the issuance, and sale of such bonds by the City as conferred upon municipalities by part II of chapter 166, Florida Statutes, other applicable state laws, and section 103 of the Internal Revenue Code of 1986.** Such bonds may be validated in accordance with chapter 75, Florida Statutes. The Authority may not authorize the issuance of general obligation bonds. Such bonds and other forms of indebtedness of the City shall be executed and attested by the officers, employees, or agents of the City, including the chief executive  officer/general manager (CEO/GM) or chief financial officer of the utility system, the Authority has so designated as agents of the City. The Authority may enter into hedging agreements or options for the purpose of moderating interest rates on existing and proposed indebtedness or price fluctuations of fuel or other commodities, including agreements for the future delivery thereof, or any combinations thereof.

(Emphasis added.)

253.    Under §7.03(1)(e) of the Special Law, The Authority is authorized to sell LITTLE's bond.

254.    The Special Law provides that the Authority has the power over the City's utility bonds including LITTLE's bond, which violates the bond covenants as

follows:

A.    Pursuant to the 2017 Series A Bonds Official Statement, the City of Gainesville has pledged the revenues of its combined utility system to the payment of these bonds. As a municipality, such pledge is imposed on the elected commissioners, to allocate within the State of Florida required budget, sufficient revenues to comply with the bond obligations.

B.    The Special Law removes the authority from the City of Gainesville to control and allocate the revenues received from its combined utilities, instead prohibiting the City from "interfering" with the running of the utilities, and providing sole control to a Board appointed by the Governor.  In doing so, the Special Law removes the revenues from the revenue bonds, and leaves the bondholders with no revenues for the payment of the City's obligations.

C.    While noting that legislative matters may affect the City, nothing in the Official Statement authorizes a severing of the revenues from the control of the City Commissioners.

D.    The pledge, for security of the bonds, is the City Commission pledging the revenues of the utility system, and that there is no other source of revenue.

255.   The Special Law contains preemption provisions, which result in the breach of the obligations to pay bond debt in a prescribed order, and to maintain a ratio of debt coverage, among other things.

256.    Because the Special Law directly authorizes the Authority to cancel, refinance, or sell, utility bonds, including LITTLE's bond, the Special Law impairs the obligations of contracts in violation of Art. I, §10 of the Florida Constitution.

257.    The breach of the bond covenant restricting GRU revenues, and the uncertainty regarding control and conflict between the Authority and the City of Gainesville, has already led to the diminution in value and loss of marketability of LITTLE's bond and that of all other holders of GRU bonds.

258.    LITTLE has suffered damages as a result of the breach of bond covenants all of which are a direct consequence of the enactment of the Special Law.

WHEREFORE, Plaintiff LITTLE prays for a declaratory judgment, for injunction and supplemental relief awarding some or all of the following relief:

A.    That this Court take jurisdiction over the parties and this cause.

B.    That this Court declare  the Special Law to be invalid because it impairs the obligation of City contracts in violation of Art. I, §10, FLA.CONST. which renders therefore the Special Law null and void *ab initio*.

C.    That this Court declare that, to the extent it must comply with the Special Law, the CITY OF GAINESVILLE has breached its bond contract with LITTLE.

D.    That this Court issue a preliminary and permanent injunction, enjoining the CITY OF GAINESVILLE, its officers, agents and employees and others acting

in concert with, or under the direction and control of Defendant, from administering, executing, and enforcing or threatening to enforce or attempting to enforce the Special Law against Plaintiff.

      E.    That the Court enter a judgment for compensatory damages against CITY OF GAINESVILLE sufficient to compensate Plaintiff LITTLE for his losses.

      F.    That  this Court award Plaintiff his costs and such other and further relief as this Court deems just.

## DECLARATION

(28 U.S.C. § 1746)

I, ROBERT HUTCHINSON, do declare as follows:

1.      I am ROBERT HUTCHINSON, one of the individual Plaintiffs named in this lawsuit.

2.      I am over the age of eighteen and competent to make this Affidavit.

3.      I am the President of GAINESVILLE RESIDENTS UNITED INC. and am authorized to execute this Declaration on behalf of the said Plaintiff.

4.      I have read the foregoing Complaint, and all of the facts alleged in the Complaint are true and correct. I have personal knowledge of those facts, with the exception of the facts pertaining to Plaintiff LITTLE's bond.

5.      I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: _July 2_, 2023.

_ROBERT HUTCHINSON_ (signature)

ROBERT HUTCHINSON

BENJAMIN, AARONSON, EDINGER & PATANZO, P.A.

  /Joseph W. Little
JOSEPH W. LITTLE, Esquire
Florida Bar No. 196749
3731 N.W. 13th Place
Gainesville, Florida 32605
(352) 273-0660
littlegnv@gmail.com

  /s/ Gary S. Edinger
GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger12@gmail.com

ANSBACHER LAW

  /s/ Terrell K. Arline
Terrell K. Arline, Esquire
Fla. Bar. No. 306584
1819 Tamiami Drive
Tallahassee, FL 32301
(850) 321-8726
tkarlinelaw@gmail.com
Terrell.Arline@ansbacher.net
Ansbacher Law, P.A.
8818 Goodby's Executive Drive
Suite 100
Jacksonville, FL 32217
(904) 737-4600

Email Addresses Designated for service
Primary:   tkarlinelaw@gmail.com
              terrell.arline@ansbacher.net
Secondary: alawpleadings@gmail.com
              jav@ansbacher.net

*Attorney for Plaintiffs*